IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

TAMERA JONES, ET AL                               CASE NO. 5:21-CV-00690

VERSUS                                                        DISTRICT JUDGE FOOTE

AMERICAN ALTERNATIVE
INSURANCE CORPORATION, ET AL          MAGISTRATE HORNSBY

## THIRD AMENDED COMPLAINT

NOW COME Plaintiffs, Tamera Jones, Avery Jones, and Tommie Dale McGlothen III, individually and on behalf of Tommie Dale McGlothen Jr., Deceased (hereinafter referred to as "Mr. McGlothen"), and Tamera Jones and Avery Jones on behalf of Kimberly Jones McGlothen, through undersigned counsel, who, with leave of Court, respectfully amend their *Complaint[1]*, *First Amended Complaint[2]*, and *Second Amended Complaint[3]* as follows:

## (I)
## INTRODUCTION

This cause of action arises from the wrongful death of Tommie Dale McGlothen, Jr. (hereinafter "Mr. McGlothen") who was beaten, pepper sprayed, tasered,  and left to die in a spit hood in the backseat of a Shreveport Police Department (hereinafter "SPD") patrol unit by the Defendants.  At the time of the killing, all of the Defendants were

---

[1] Record Document 1.
[2] Record Document 28.
[3] Record Document 45.

acting under color of law and as a law enforcement officer or firefighter/paramedic employed by the City of Shreveport.  After the killing of Mr. McGlothen, an investigation of the events was conducted by various law enforcement agencies, including the Shreveport Police Department and the Caddo Parish District Attorney's Office.  As a result of these investigations, Defendants Ross, LeClare, McCarter, and Johnson were indicted on charges of malfeasance in office (Docket No. 378599) and negligent homicide (Docket No. 378600) on September 18, 2020, by the Grand Jury of the Parish of Caddo for their conduct which forms the basis of this action.

After the death of Mr. McGlothen, Plaintiffs' counsel made a Public Records Request for documents pertaining to this action, this incident, and the subsequent investigations from the City of Shreveport  and  the Caddo Parish Coroner's Office.  To date, these governmental entities have failed or refused to provide all of the requested documents.  As Mr. McGlothen was killed by the Defendants, Plaintiffs are at a disadvantage in drafting this Complaint without full disclosures from the appropriate parties.  *See Bazan v. Hidalgo County*, 246 F.3d 481, 492-493 (5th Cir. 2001).  Accordingly, at the time of the filing of this *Third Amended Complaint*, the Plaintiffs have not been provided access to all pertinent records and expressly reserve their right to amend this complaint and add additional allegations and/or parties upon receipt of the pertinent records and identification of additional facts and/or parties.

**(II)**
**PARTIES**

1.     Made Plaintiffs herein are:

    A.     Tamera Jones. She is the surviving daughter of Tommie Dale McGlothen Jr. and Kimberly Jones McGlothen. Plaintiff        Tamara Jones is, and at all     relevant times was, a citizen of the United States and a resident of Caddo     Parish, State of Louisiana and is entitled to bring this action under  Louisiana law for all general, special, compensatory, punitive, and permissible damages;

    B.     Avery Jones. He is the surviving son of Tommie Dale McGlothen Jr. and     Kimberly Jones McGlothen. Plaintiff Avery Jones is, and at all relevant times was, a citizen of the United States and a resident of Caddo Parish, State of Louisiana and is entitled to bring this action under Louisiana law for all general, special, compensatory, punitive, and permissible damages;

    C.     Tommie Dale McGlothen III. He is the surviving son of Tommie Dale McGlothen Jr. Plaintiff Tommie Dale McGlothen III is, and at all relevant times was, a citizen of the United States and a resident of Caddo Parish, State of Louisiana and is entitled to bring this action under Louisiana law for all general, special, compensatory, punitive, and permissible damages; and

    D.     Kimberly Jones McGlothen was the surviving spouse of Tommie Dale   McGlothen Jr. at the time of his death. Unfortunately, she passed away in 2021 and is survived by her children, Tamera Jones and Avery Jones.

2.     Made Defendants herein are:

    A.     American Alternative Insurance Corporation (hereinafter referred to as "Defendant Insurer"), a foreign insurer authorized to do and doing business in the State of Louisiana, which may be served through the Louisiana Secretary of State;

    B.     City of Shreveport (hereinafter referred to as "Defendant City"), a municipal corporation organized and existing under the laws of the State of Louisiana and is responsible for the policies, practices, customs, and regulations of the City of Shreveport Police

Department and the City of Shreveport Fire Department (hereinafter "SFD"); and for the hiring, training, supervision, and discipline of agents, employees, and police officers, firemen, and EMS personnel of the City of Shreveport Police Department and City of Shreveport Fire Department.  Said Defendant may be served by serving Mayor Adrian Perkins, 505 Travis Street, Suite 200, Shreveport, Louisiana 71101;

C.    Ben Raymond (hereinafter referred to as "Defendant Raymond"), the Chief of Police for the City of Shreveport Police Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, he had supervisory and managerial authority over Defendants McCarter, Ross, Johnson, and LeClare. In his capacity as Chief of Police, said Defendant is responsible for the management and operation of the City of Shreveport Police Department and specifically responsible for ensuring that the police officers of the City of Shreveport Police Department complied with the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Police Department.  Furthermore, said Defendant is responsible for the policies, practices, customs, and regulations of the City of Shreveport Police Department; and for the hiring, training, supervision, and discipline of agents, employees, and police officers of the City of Shreveport Police Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at 505 Travis Street, Shreveport, Caddo Parish, Louisiana 71101;

D.    Treona A. McCarter (hereinafter referred to as "Defendant McCarter"), a sworn police officer of the City of Shreveport and/or the City of Shreveport Police Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, in her capacity as a police officer, said Defendant was responsible for policing the City of Shreveport under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Police Department. Said Defendant is sued in her individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at her personal residence in Louisiana;

E.    Brian M. Ross (hereinafter referred to as "Defendant Ross"), a sworn

4

police officer of the City of Shreveport and/or the City of Shreveport Police Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, in his capacity as a police officer, said Defendant was responsible for policing the City of Shreveport under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Police Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at his personal residence in Louisiana;

F.    D'Marea J. Johnson (hereinafter referred to as "Defendant Johnson"), a sworn police officer of the City of Shreveport and/or the City of Shreveport Police Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, in his capacity as a police officer, said Defendant was responsible for policing the City of Shreveport under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Police Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at his personal residence in Louisiana;

G.    James M. LeClare (hereinafter referred to as "Defendant LeClare"), a sworn police officer of the City of Shreveport and/or the City of Shreveport Police Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, in his capacity as a police officer, said Defendant was responsible for policing the City of Shreveport under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Police Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at his personal residence in Louisiana;

H.    Scott Wolverton (hereinafter referred to as "Defendant Wolverton"), the Fire Chief for the City of Shreveport Fire Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, he had supervisory and managerial authority over Defendants Glass,

Yelvington, and Richardson. In his capacity as Fire Chief, said Defendant is responsible for the management and operation of the City of Shreveport Fire Department and specifically responsible for ensuring that the firefighters and EMS personnel of the City of Shreveport Fire Department complied with the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Fire Department. Furthermore, said Defendant is responsible for the policies, practices, customs, and regulations of the City of Shreveport Fire Department; and for the hiring, training, supervision, and discipline of agents, and employees, of the City of Shreveport Fire Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at 505 Travis Street, Shreveport, Caddo Parish, Louisiana 71101;

I.      Billy C. Glass (hereinafter referred to as "Defendant Glass"), a Captain of the City of Shreveport and/or the City of Shreveport Fire Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, in his capacity as a Captain of the City of Shreveport Fire Department, said Defendant was responsible for serving the City of Shreveport under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Fire Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at his personal residence in Louisiana;

J.      Joshua W. Yelvington (hereinafter referred to as "Defendant Yelvington"), a Fire Engineer of the City of Shreveport and/or the City of Shreveport Fire Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, in his capacity as a Fire Engineer of the City of Shreveport Fire Department, said Defendant was responsible for serving the City of Shreveport under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Fire Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at his personal residence in Louisiana; and

K.      Clint W. Richardson (hereinafter referred to as "Defendant

Richardson"), a Firefighter of the City of Shreveport and/or the City of Shreveport Fire Department, is a person of suitable age and capacity and is an adult resident of the Western District of Louisiana. At all times pertinent herein, in his capacity as a Firefighter of the City of Shreveport Fire Department, said Defendant was responsible for serving the City of Shreveport under the color and pretense of the federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Louisiana and the City of Shreveport Fire Department. Said Defendant is sued in his individual capacity. Said Defendant is a resident and citizen of the State of Louisiana and may be served with process at his personal residence in Louisiana;

**(III)**
**JURISDICTION AND VENUE**

3.      This civil rights action is brought pursuant to 42 U.S.C. §§ 1981, 1983 & 1985 & 1986. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343(a)(1), (3), and (4). Accordingly, this Honorable Court has jurisdiction over all of the claims asserted herein.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all of the defendants reside in the Western District of Louisiana and all of the relevant events occurred in within this District.

5.      Each and all of the acts of the Defendants and employees or agents of the City of Shreveport involved in this incident were performed under the color and pretense of the constitutions, statues, ordinances, regulations, customs and usages of the United States of America, the State of Louisiana, under the color of law and by virtue of their official office and authority as law enforcement officers, firemen, and agents of the City of Shreveport.

**(IV)**
**STATEMENT OF FACTS**

6.      The *Third Amended Complaint* realleges, and where a conflict arises supersedes, all of the original allegations set forth in the *Complaint[4]*, *First Amended Complaint[5]*, and *Second Amended Complaint[6]*.

7.      The killing of Mr. McGlothen occurred in Shreveport, Caddo Parish, Louisiana on or about April 5, 2020.

8.      Prior to the killing of Mr. McGlothen, Defendants Johnson, Ross, McCarter, and LeClare were employed by the City of Shreveport as law enforcement officers.  At all times material hereto, these Defendants were acting under color of state law.

9.      Prior to the killing of Mr. McGlothen, Defendants Wolverton, Glass, Yelvington, and Richardson were employed by the City of Shreveport as firefighters and/or fire engineers.  At all times material hereto, these Defendants were acting under color of state law.

10.      Prior to the death of Mr. McGlothen, Defendant Johnson had a sustained IAB history for violations of SPD policy.

11.      Prior to the death of Mr. McGlothen, Defendant LeClare had a sustained IAB history for violations of SPD policy.

12.      Defendants Ross, LeClare, McCarter, and Johnson were indicted on charges of malfeasance in office (Docket No. 378599) and negligent homicide (Docket No. 378600)

---

[4] Record Document 1.
[5] Record Document 28.
[6] Record Document 45.

on September 18, 2020, by the Grand Jury of the Parish of Caddo for their conduct which forms the basis of this action.

13.     Defendants Glass, Yelvington, and Richardson were investigated by Shreveport Fire Department Internal Affairs in relation to their participation in the events involving Mr. McGlothen on April 5, 2020. Allegations against all three defendants were sustained by internal affairs.

14.     April 5, 2020, at 17:29:28 Mr. McGlothen's father called the Shreveport Police Department requesting an officer come to the family's home at 1316 Hassett Avenue because his son, Mr. McGlothen, was "outside yelling" and "out of control" and just acting really weird on this date.

15.     Specifically, Mr. McGlothen's father advised 911 during the 17:29 call that his son, Mr. McGlothen, had stopped taking his medication and needed someone to help the family tend to him because he "is running around and acting stupid." He further advised 911 that Mr. McGlothen was not armed with any weapon and would probably run from police.

16.     When officers for the Shreveport Police Department arrived at Mr. McGlothen's home shortly thereafter, and in response to, the 17:29 call to 911 by his father, they were advised by the family that Mr. McGlothen was off of his medication and that he had paranoid schizophrenia.[7]

---

[7] Please refer to this link: https://cochranfirm.sharefile.com/d-s91b610bba59e470b8fb63a51a2aa6587 and Exhibit 1, Disc 2 manually attached to this filing.

17.     Shortly after 17:29 when officers first encountered Mr. McGlothen, they advised him that they were there to check on his well-being. At this time, Mr. McGlothen denied wanting to harm himself or anyone else. While Mr. McGlothen's family expressed concern that he was outside and running around and yelling, they unambiguously conveyed to officers that Mr. McGlothen was not dangerous and had never harmed anyone. Mr. McGlothen did not struggle with officers and complied with their assistance in relocating near a patrol unit to speak with officers. Mr. McGlothen was calm throughout this first encounter with officers. Mr. McGlothen had a lanyard with an identification card attached around his neck and he was holding a red ink pen. Upon information and belief, Mr. McGlothen wrote on the hood of a patrol unit with the pen during this first encounter.[8]

18.     During this first encounter with officers for the Shreveport Police Department, officers were advised by Mr. McGlothen's family that he had been committed previously for his mental illness on multiple occasions and the most recent was August 2019, just eight months prior.[9]

19.     Defendant Johnson was among the officers who responded to the first call involving Mr. McGlothen on April 5, 2020. Officers advised Mr. McGlothen's family that he did not presently meet the officers' criteria for commitment and that if the situation worsened to call them back to the scene. Specifically, Mr. McGlothen's family was advised by officers that until he got more out of hand he would not fit their criteria for

---

[8] Id.
[9] Id.

commitment. Mr. McGlothen's family was advised by officers to contact the Caddo Coroner's office the next day (Monday) to seek his assistance in committing Mr. McGlothen.[10]

20.     At no time during this first encounter was Mr. McGlothen aggressive or combative with officers or bystanders. Throughout the first encounter, Mr. McGlothen was clearly an emotionally disturbed person (EDP) whose behavior was consistent with that of a person suffering from unmedicated paranoid schizophrenia.

21.     At no time during this first encounter with Mr. McGlothen on April 5, 2020, did any officer seek support or consultation from a superior officer or a person trained in crisis intervention either at the scene or elsewhere regarding what options were available to secure help for Mr. McGlothen's obvious mental disabilities.

22.     Officers with the Shreveport Police Department left the Hassett Avenue residence without taking any further action.

23.     Thereafter, at approximately 18:30 Defendant Ross and Defendant McCarter encountered Mr. McGlothen in the midst of his mental health crisis near Hassett Aveneue. This was the Shreveport Police Department's second encounter with Mr. McGlothen on April 5, 2020.

24.     Defendant Ross observed Mr. McGlothen jogging in or near a parking lot near a closed bank. Defendant Ross was posting at this time to complete paperwork when he was approached by a citizen complainant. The complainant advised that he had

---

[10] Id.

stopped his vehicle to send a text message and heard his vehicle's rear door open and close. At that time, he saw Mr. McGlothen in the backseat of his vehicle. The complainant punched Mr. McGlothen in his face and Mr. McGlothen exited the vehicle without further incident. The complainant advised Defendant Ross that "something wrong with his a - - ."[11]

25.      Defendant Ross made contact with Mr. McGlothen and told him to turn around and put his hands on the patrol unit. Before Defendant Ross could do anything else, Mr. McGlothen removed his hands from the patrol unit and said "Dale Bey North American National."  Defendant Ross did not articulate his intention of handcuffing Mr. McGlothen prior to initiating force upon Mr. McGlothen's person. Defendant Ross grabbed Mr. McGlothen and told him "stop tensing up or I'll take your a - - down to the ground."  At this time, it was clear that Mr. McGlothen was experiencing some type of mental crisis based on his unmedicated paranoid schizophrenia.  At this time, Mr. McGlothen was attempting to comply with Defendant Ross' instructions to the best of his ability under the circumstances. Finally, at this time, Mr. McGlothen was not resisting arrest, attempting to flee, nor was he charged with any serious crimes.

26.      While Mr. McGlothen was suffering from an obvious mental condition, Defendant Ross suddenly and without warning threw Mr. McGlothen to the ground where he proceeded to handcuff him without incident. Defendant Ross told another officer at the scene that he "threw him (Mr. McGlothen) on the ground." Defendant Ross

---

[11] Please refer to this link: https://cochranfirm.sharefile.com/d-s91b610bba59e470b8fb63a51a2aa6587 and Exhibit 1, Disc 1 manually attached to this filing.

did not allow Mr. McGlothen the opportunity to allow himself to be handcuffed prior to throwing him to the ground. Therefore, the actions of Defendant Ross were excessive and unconstitutional and were grossly disportionate to the actions of Mr. McGlothen, if any. This takedown was not a measured or ascending response to any action taken by Mr. McGlothen and amounted to objectively unreasonable, excessive, and gratuitous force.[12]

27.     At the time Defendant Ross threw Mr. McGlothen to the ground, he was taking no action which posed a threat to any officer. Mr. McGlothen was calm and non-combative.

28.     At the time Defendant Ross threw Mr. McGlothen to the ground, he was not suspected of any violent offense. At most, Mr. McGlothen was suspected of trespassing. At no time during this encounter with Defendant Ross was Mr. McGlothen suspected of any violent offense nor was he suspected of any felony offense.

29.     At the time Defendant Ross threw Mr. McGlothen to the ground, he was not actively resisting arrest. He was not even passively resisting arrest.

30.     At the time Defendant Ross threw Mr. McGlothen to the ground, he was not attempting to evade arrest by flight. To the best of his diminished capacity ability, Mr. McGlothen was complying with Defendant Ross's commands.

31.     After Mr. McGlothen was secured in cuffs and placed in the rear of Defendant Ross's patrol unit, Defendant Ross attempted in vain to question Mr. McGlothen about the events involving the complainant's vehicle. The following are

---

[12] Id.

excerpts of that illogical and irrational conversation[13]:

> Ross: What you tryin to get in his truck for?
> McGlothen: I don't answer questions.
> Ross: Well you gonna answer this question today. Why did you try to get in his car?
> McGlothen: I didn't get in no car.
> Ross: Why did you try to?
> McGlothen: What is a car?
> Ross: This motherf - - - - - is asking me what is a car.
>
> Ross: Where you live at Dale Bey?
> McGlothen: I don't live nowhere.
> Ross: You homeless?
> McGlothen: No.
>
> Ross: What's that mean?
> McGlothen: Noble from birth, ancient descendant of the great pharohs of Kemmet, ancient mobites and cannonites.
>
> Ross: What's your birthday?
> McGlothen: I don't have a birthday. I have a naturalize.
> Ross: When were you naturalize?
> McGlothen: A long time ago.
>
> Ross: Do you understand your Miranda rights?
> McGlothen: I don't understand anything. I overstand.

32.     This conversation clearly illustrates that Mr. McGlothen was suffering from a mental disability, unmedicated paranoid schizophrenia.  Defendant Ross advised someone present at this scene that, regardless of whether or not the complainant desired to press charges for Mr. McGlothen entering his vehicle, Mr. McGlothen would not be taken to jail because they "cannot take anyone in for non-violent crimes because of the coronavirus."[14]

---

[13] Id.
[14] Id.

33.     Defendant Ross advised someone present at this scene that "my thing is he already crazy and that's why I hate this sh- -…if we let him go, he gone do the same sh- -…We're gonna get another call on him."[15]   Despite this knowledge, Defendant Ross failed to contact a supervisor or someone with experience in dealing with emotionally disturbed persons to determine what options and resources were available to assist Mr. McGlothen's condition.

34.     Throughout the cumbersome and irrational attempted conversation between Defendant Ross and Mr. McGlothen, Defendant McCarter can be heard laughing at Mr. McGlothen's responses to Defendant Ross's questions.[16]

35.     Mr. McGlothen was an emotionally disturbed person (EDP) on April 5, 2020, and Defendants Ross and McCarter, rather than secure medical attention for him, used their time with him to make fun of him. Defendant Ross, while releasing Mr. McGlothen from custody, tells him that he failed at being a sovereign citizen and that he is an American citizen. Further, Defendant Ross tells Mr. McGlothen "you're embarrassing yourself, Trump would be so disappointed." Defendant McCarter is laughing at this exchange in the background.[17]

36.     At no time during this second encounter was Mr. McGlothen aggressive or combative with officers or bystanders. Throughout the second encounter, Mr. McGlothen was clearly an emotionally disturbed person whose behavior was consistent with that of

---

[15] Id.

[16] Id.

[17] Id.

a person suffering from unmedicated paranoid schizophrenia. He was not armed and only possessed the identification card and red ink pen he held during the first encounter.

37.     By entering someone's vehicle without consent and being subjected to physical force, Mr. McGlothen's condition had decompensated since the first encounter and he was now a danger to himself. He was not, however, a danger to anyone else. At no time during this encounter did anyone express concern that Mr. McGlothen was a threat to anyone.

38.     At no time during this second encounter with Mr. McGlothen on April 5, 2020, did any officer seek support or consultation from a superior officer or crisis intervention personnel either at the scene or elsewhere regarding what options were available to secure help for Mr. McGlothen. Instead of attempting to seek a resolution to Mr. McGlothen's situation or expressing any concern for his welfare, officers instead made jokes at his expense.

39.     Instead of seeking help for Mr. McGlothen, Defendant Ross states "he crazy as Hell… he needs to be EC'd but he ain't gone answer those simple questions…would I be wrong to drop him off on the East side?" Defendant McCarter's reply to Defendant Ross is laughter.[18]

40.     Defendants Ross and McCarter could have transported Mr. McGlothen for involuntary commitment at this time given his apparent inability to protect himself and his obvious danger to himself by engaging in erratic behavior.

---

[18] Id.

41.     At the time of this second encounter, Mr. McGlothen had no visible injuries to his face or body.

42.     Shortly after the conclusion of the second encounter with Mr. McGlothen, a homeowner called 911 to report that a man came into her yard when her husband was letting her into the driveway. She did not report that the subject was threatening or posing a danger to either herself or to her husband.[19]

43.     Specifically, the complainant called her husband on her way home from work so that he could let her into the driveway. Upon arrival to her home, she saw Mr. McGlothen standing on the passenger side of her vehicle holding an ink pen and a card the size of a business card. The complainant said she thought to herself "what's wrong with him?"

44.     Mr. McGlothen followed the complainant's vehicle as she pulled into her driveway. Before she could exit her vehicle, her husband confronted Mr. McGlothen in their front yard and asked Mr. McGlothen why he was in their yard.

45.     The complainant's husband told Mr. McGlothen to leave their driveway. The complainant's husband then went inside the home and Mr. McGlothen followed him inside. The homeowner pulled a pistol on Mr. McGlothen at which time Mr. McGlothen backed out of the home and back into the front yard. The homeowner could tell from Mr. McGlothen's eyes that something was wrong with him and he did not shoot Mr.

---

[19] Please refer to this link: https://cochranfirm.sharefile.com/d-s91b610bba59e470b8fb63a51a2aa6587 and Exhibit 1, Discs 3 and 4 manually attached to this filing.

McGlothen because he wanted to show him compassion. Further, Mr. McGlothen was not armed or threatening either homeowner after he retreated to the front yard.

46.     The homeowner went back outside after Mr. McGlothen had exited the home and Mr. McGlothen approached the homeowner at which time the homeowner forcefully shoved Mr. McGlothen to the ground.  When he fell, Mr. McGlothen's pants fell down. While Mr. McGlothen fixed his pants, the homeowner went back inside the home and locked the door.

47.     At no time was either homeowner afraid of Mr. McGlothen. At no time did either homeowner feel imprisoned or that they were in danger from Mr. McGlothen. Both homeowners unambiguously asserted that they knew something was wrong with Mr. McGlothen and they wanted to show him compassion. The homeowners felt empathy and compassion for Mr. McGlothen and not fear of him.

48.     At no time was Mr. McGlothen a danger to either the complainant homeowners or any member of law enforcement, including Defendant Officers.

49.     At the time of the third encounter, Mr. McGlothen's behavior endangered him and he was a danger to himself through his poor judgment.

50.     When the call for service was dispatched over the radio, Defendant McCarter responded "I know who that is" and then advised that she would be on scene in about sixty seconds.  However, no person trained in crisis intervention or dealing with emotional disturbed persons was dispatched.

51.     At 19:42:20, officers with the Shreveport Police Department encountered

18

Mr. McGlothen in the midst of his mental breakdown for a third and final time.

52.   Upon their arrival at the scene, Mr. McGlothen was standing outside the home holding a red ink pen and the same identification card from the prior two encounters.

53.   At the time of Defendant Officers' arrival at the scene of this third encounter, Mr. McGlothen had no visible injuries to his face or body.

54.   As soon as Defendant McCarter exited her patrol unit, she commenced yelling and cursing at Mr. McGlothen. She did not request the assistance of a supervisor or crisis intervention officer prior to engaging Mr. McGlothen. Defendant McCarter knew that Mr. McGlothen was an EDP prior to her arrival at the scene of his third encounter with SPD on April 5, 2020, based on her own prior interaction with Mr. McGlothen. However, no officers specifically trained in crisis intervention or dealing with EDP were dispatched.

55.   Defendant McCarter is approximately 5'7" tall and weighs approximately 165 pounds. She was wearing a Kevlar vest and armed with a baton, conducted energy weapon (CEW), and firearm.

56.   Defendant Ross arrived on the scene just seconds behind Defendant McCarter.

57.   Defendant Ross is 6'1" tall and weighs approximately 195 pounds. He was wearing a Kevlar vest and armed with a baton, CEW, and firearm.

58.   As soon as Defendant Ross exited his patrol unit, he yells to Defendant McCarter "tase his a- -." He did not request the assistance of a supervisor or crisis

19

intervention officer prior to engaging Mr. McGlothen. Defendant Ross knew that Mr. McGlothen was an EDP prior to her arrival at the scene of his third encounter with SPD on April 5, 2020, based on his own prior interactions with Mr. McGlothen.

59.     No crisis intervention or de-escalation tactics whatsoever were attempted or employed before either Defendant Ross or Defendant McCarter engaged Mr. McGlothen in a violent physical encounter.

60.     Defendant Ross and Defendant McCarter immediately attacked Mr. McGlothen and threw him to the ground and physically assaulted him including kicking, punching, pepper spraying, and tasering Mr. McGlothen.  These actions amount to the use of unconstitutional and excessive force.  The actions of the Defendant officers were grossly disproportionate to the actions of Mr. McGlothen, if any.

61.     At the time Defendant Ross and Defendant McCarther threw Mr. McGlothen to the ground, he was taking no action which posed a threat to any officer. Mr. McGlothen was calm and non-combative.

62.     At the time Defendant Ross and Defendant McCarter threw Mr. McGlothen to the ground, he was not suspected of any violent offense.

63.     At the time Defendant Ross and Defendant McCarter threw Mr. McGlothen to the ground, he was not actively resisting arrest. He was not even passively resisting arrest.

64.     At the time Defendant Ross and Defendant McCarter threw Mr. McGlothen to the ground, he was not attempting to evade arrest by flight.

65.     Defendants Ross and McCarter tackled Mr. McGlothen who was neither fleeing, being violent, nor being aggressive.

66.     Defendant Johnson arrived to the scene and immediately joined Defendants Ross and McCarter in their assault of Mr. McGlothen. At no time did Defendant Johnson attempt any de-escalation tactics before joining the violent encounter. He did not request the assistance of a supervisor or crisis intervention officer prior to engaging Mr. McGlothen. Defendant Johnson knew that Mr. McGlothen was an EDP prior to his arrival at the scene of this third encounter with SPD on April 5, 2020, based on his prior interaction with Mr. McGlothen.

67.     Defendant Johnson is 6' tall and weighs approximately 160 pounds. He was wearing a Kevlar vest and armed with a baton, CEW, and firearm.

68.     The first three Defendant Officers on the scene of the third encounter knew Mr. McGlothen was an emotionally disturbed person (EDP) upon their arrival on the scene based on their own prior interactions with him on April 5, 2020.

69.     Defendant LeClare was the fourth defendant officer to arrive at the scene. He immediately charged a restrained Mr. McGlothen and violently struck him in the head and face with his closed fist. At no time did Defendant LeClare attempt any de-escalation tactics before engaging in a violent attack on Mr. McGlothen.  He did not request the assistance of a supervisor prior to engaging Mr. McGlothen. When Defendant LeClare first struck Mr. McGlothen in his face, he was being held down on the concrete by three other police officers and was not resisting them with force or violence.

70.     Defendant LeClare is 5'9" tall and weighs approximately 180 pounds. He

was wearing a Kevlar vest and armed with a baton, CEW, and firearm.

71.     The only resistance, if any, given by Mr. McGlothen during this third encounter was keeping his hands underneath him so that he could not be handcuffed. He did not strike officers, attempt to flee, or fight them. He did not threaten any Defendant Officer with a weapon. At no time on April 5, 2020, during any encounter with any Defendant Officer did Mr. McGlothen possess any weapon or threaten any Defendant Officer.

72.     There is no indication on any recording of this encounter that Mr. McGlothen's actions were anything more than wiggling and "acting stupid." His behavior is at no time described as combative, aggressive, or fighting by Defendant Officers during the actual encounter.

73.     All four Defendant Officers simultaneously exerted force upon Mr. McGlothen while he was neither fleeing, attempting to flee, being violent, being aggressive, nor resisting other than by pulling his arms away.

74.     Defendant Ross exposed Mr. McGlothen to six CEW cycles with a duration of thirty-four (34) seconds. Twenty-nine (29) of those seconds were continuous. This occurred prior to Mr. McGlothen being secured in handcuffs and while he was on the ground being physically restrained and beaten by Defendants McCarter, Johnson, and LeClare.

75.     Defendant McCarter also exposed Mr. McGlothen to a CEW for an unknown duration.  This occurred prior to Mr. McGlothen being secured in handcuffs and while he was on the ground being physically restrained and beaten by Defendants

Ross, Johnson, and LeClare.

76.     At 19:47 Mr. McGlothen was in custody and placed in the back of Patrol Unit 530 with his head near the floorboard and his feet in the air.

77.     At 19:49:06 Shreveport Fire Department EMS was called to assess the Defendant Officers who allegedly sustained injuries during their assault on Mr. McGlothen.

78.     At 19:54:12 Mr. McGlothen was asking for help and saying "don't kill me"; "I can't breathe."

79.     When Mr. McGlothen advised Defendant Officers that his face was burning from the pepper spray, Defendant Ross told him "I don't give a f- - - what your face is doing, you're lucky you're a- - ain't burning."

80.     Defendant Ross asked Mr. McGlothen if he wanted to be sprayed with pepper spray again after he was secured in handcuffs and in the back of the patrol unit.

81.     At 19:58:26 Shreveport Fire Department EMS arrived on the scene to assess and treat the Defendant Officers and provide Defendant Officers with a spit mask to put on Mr. McGlothen.

82.     At 20:02 Mr. McGlothen states "I can't hardly breathe now."

83.     At 20:04:41 a spit mask was placed on Mr. McGlothen by an employee of Defendant City.

84.     At 20:05:14 Mr. McGlothen was removed from the patrol unit to be evaluated by Defendants Glass, Yelvington, and Richardson.

85.     At 20:06:30 Mr. McGlothen was placed back inside the patrol unit, after a

23

one minute and sixteen second (1:16) evaluation by Defendants Glass, Yelvington, and Richardson.

86.    At 20:20 Mr. McGlothen was unconscious and unresponsive.

87.    At 20:20:15 Mr. McGlothen stopped breathing.

88.    At 20:36 one of the Defendant Officers noticed Mr. McGlothen did not have a pulse.

89.    At 20:36 Shreveport Fire Department EMS is called back to the scene for Mr. McGlothen.

90.    At 20:38:16 Mr. McGlothen is removed from the patrol unit with CPR in progress. Three (3) of his ribs were fractured during CPR attempts.

91.    At 20:43 Shreveport Fire Department EMS is on scene with Mr. McGlothen.

92.    Mr. McGlothen suffered metabolic acidosis, shock, and cardiac arrest on or about April 5, 2020.

93.    Upon arrival at Willis Knighton North at approximately 21:03:32, Mr. McGlothen was severely acidotic with a pH of 7 with a bicarb of 6 on his renal panel.

94.    Upon arrival at Willis Knighton North, Mr. McGlothen was in severe shock and hypotensive with pressure in the 60s.

95.    At 21:17 Mr. McGlothen's father called Shreveport Police Department to report his son missing and advised that his son was schizophrenic and not taking his medication. Upon information and belief, Mr. McGlothen's father was advised that his son had been arrested and was not missing.

96.    Defendant Ross used pepper spray on Mr. McGlothen. This occurred prior

to Mr. McGlothen being secured in handcuffs and while he was on the ground being physically restrained and beaten by Defendants McCarter, Johnson, and LeClare.

97.     After spraying Mr. McGlothen with pepper spray, Defendants continued to expose him to a CEW. This occurred prior to Mr. McGlothen being secured in handcuffs and while he was on the ground being physically restrained and beaten by Defendant Officers.

98.     After being sprayed with pepper spray, Mr. McGlothen began to involuntarily spit. This involuntary spitting continued from the time of exposure until his respiration ultimately ceased.

99.     Pepper (oleoresin capsicum) spray exposure can cause, *inter alia*, immediate and violent inflammation of mucous membranes, laryngeal and pulmonary oedema, laryngeal paralysis, chemical pneumonitis, disorientation, fear, loss of body motor control, hyperventilation, tachycardia, headache, stroke, and heart attack.

100.     Defendant Ross used his baton on Mr. McGlothen prior to him being secured in handcuffs.

101.     Defendant McCarter, upon information and belief, punched Mr. McGlothen in his face multiple times after he was secured in handcuffs.

102.     Defendant LeClare punched Mr. McGlothen in his face prior to him being placed in handcuffs.

103.     Defendant Johnson shoved Mr. McGlothen, causing him to fall to the ground face first, after he was secured in handcuffs.

104.     Defendant LeClare slammed Mr. McGlothen on the hood of the patrol unit

and elbowed him in his face after he was secured in handcuffs.

105.    Defendant Johnson drive stunned Mr. McGlothen three times with his CEW.

106.    During this violent encounter with Defendants, Mr. McGlothen had in his possession an ink pen and an identification card; no weapon.

107.    Mr. McGlothen was pronounced deceased on April 6, 2020. At the time of his autopsy, he was 5'10" and weighed 173 pounds.

108.    The following physical injuries to Mr. McGlothen's body are detailed in his autopsy:

    a.    minor blunt force injuries to left eye with edema and contusion of upper lid;

    b.    cutaneous abrasions involving anterior left cheek, left eyebrow, each temple region, anterior right shoulder, each upper posterior shoulder, each elbow, dorsal right forearm, each dorsal hand, each knee, anterior lower right leg and medial left chest;

    c.    each temporal scalp region with subcutaneous hemorrhage and hemorrhage within each temporalis muscle.

109.    Mr. McGlothen's toxicology report ancillary to his autopsy revealed the presence of THC, a depressant, in addition only to medications administered by health care providers who were trying to save his life. He was not under the influence of any drug which would create a hallucinogenic or psychedelic distortion of Mr. McGlothen's perceptions. He was not under the influence of meth, cocaine, or any other substance

which could seemingly make him stronger for any period of time.

110.    Mr. McGlothen was known to Defendants Johnson, Ross, and McCarter as an emotionally disturbed person (EDP) prior to the third encounter on April 5, 2020. Upon information and belief, Defendant LeClare also had prior knowledge of the first two encounters with other officers prior to his encounter with him on April 5, 2020, from his conversations with other Defendant Officers.

111.    Defendant Officers made no attempt to de-escalate the situation or call crisis intervention officers to deal with Mr. McGlothen during the third encounter. While he had been calm and cooperative during the first two encounters, there was categorically no reason or justification for Defendant Officers to immediately proceed to excitement and violence during the third encounter. For all intents and purposes, nothing had changed in regard to Mr. McGlothen's behavior from the prior incidents. Specifically:

a.    Mr. McGlothen was still aimlessly wandering the streets with an identification card and ink pen in his hand;

b.    Mr. McGlothen was still saying things that did not make sense and referring to himself at "Dale Bey North American National";

c.    Mr. McGlothen was still going onto property where he had no reason to go;

d.    Mr. McGlothen was still not threatening anyone;

e.    No one was fearful of Mr. McGlothen;

f.    Mr. McGlothen was still unarmed;

g.    Mr. McGlothen had not consumed illicit drugs which would cause

hallucinogenic or psychedelic distortion of his perceptions;

h.      Mr. McGlothen was still calm;

i.      Mr. McGlothen was not physically confronting anyone;

j.      Mr. McGlothen was not attempting to flee from the officers;

k.      Mr. McGlothen was not attempting to fight the officers;

l.      Mr. McGlothen was not actively resisting the officers.

112.   Upon information and belief, Mr. McGlothen could have been handled during the third encounter the way he was handled during the first encounter had Defendant Officers not chosen to take out their frustration with him via unnecessary violence simply because they were tired of dealing with him in the midst of his mental health crisis.  Specifically, Mr. McGlothen could and should have been transported for commitment instead of forcefully taken into custody with the intent of transporting him to jail.

113.   Defendant Officers chose to physically engage and batter and brutalize Mr. McGlothen because this was their third encounter with him and they wanted to punish him and teach him a lesson.

114.   As Mr. McGlothen sat in the back of the patrol unit with his life slipping away, Defendant Ross states to other officers present at the scene "nobody was getting their a - - whopped but him." In other words, the only person at the scene on Eileen who was being beaten or battered was Mr. McGlothen. None of the Defendant Officers were being brutalized in any manner whatsoever by Mr. McGlothen at any time during that fatal encounter. At no time did Mr. McGlothen resist the Defendant Officers with any

28

force.

115.    Throughout the third encounter, Defendants Ross, LeClare, McCarter, and

Johnson intermittently shut off their microphones to prevent recording.

116.    In 2019, Defendant Ross was accused of excessive force by a female subject.

After an incomplete and biased investigation, he was exonerated. During this alleged

encounter, Defendant Ross was not utilizing a microphone.

117.    Taser International, the manufacturer of the CEWs used by the Defendant

Officers during their encounter with Mr. McGlothen, warns users as follows:

> Cumulative Effects. CEW exposure causes certain effects, including physiologic
> and metabolic changes, stress, and pain. In some individuals, the risk of death or
> serious injury may increase with cumulative CEW exposure. Repeated, prolonged,
> or continuous CEW applications may contribute to cumulative exhaustion, stress,
> cardiac, physiologic, metabolic, respiratory, and associated medical risks which
> could increase the risk of death or serious injury. Minimize repeated, continuous,
> or simultaneous exposures.
>
> Physiologic and Metabolic Effects. CEW use causes physiologic and/or metabolic
> effects that may increase the risk of death or serious injury. These effects include
> changes in blood chemistry, blood pressure, respiration, heart rate and rhythm,
> and adrenaline and stress hormones, among others. In human studies of electrical
> discharge from a single CEW of up to 15 seconds, the effects on acid/base balance,
> creatine kinase, electrolytes, stress hormones, and vital signs were comparable to
> or less than changes expected from physical exertion similar to struggling,
> resistance, fighting, fleeing, or from the application of some other force tools or
> techniques. Some individuals may be particularly susceptible to the effects of CEW
> use. These susceptible individuals include the elderly, those with heart conditions,
> asthma or other pulmonary conditions, and people suffering from excited
> delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug
> abuse, and/or over-exertion from physical struggle. In a physiologically or
> metabolically compromised person, any physiologic or metabolic change may
> cause or contribute to sudden death.
>
> Minimize the number and duration of CEW exposures. Most human CEW lab
> testing has not exceeded 15 seconds of CEW application, and none has exceeded
> 45 seconds. Use the shortest duration of CEW exposure objectively reasonable to

accomplish lawful objectives, and reassess the subject's behavior, reaction, and resistance before initiating or continuing the exposure. If a CEW deployment is ineffective in incapacitating a subject or achieving compliance, consider alternative control measures in conjunction with or separate from the CEW.

Avoid simultaneous CEW exposures. Do not use multiple CEWs or multiple completed circuits at the same time without justification. Multiple CEWs or multiple completed circuits at the same time could have cumulative effects and result in increased risks.

118.    Repeated and prolonged exposure to a conducted energy weapon can cause metabolic acidosis and sudden death. This is exactly what occurred in this case.

119.    Exposure to a CEW after deployment of a chemical agent such as pepper spray can cause a subject to catch fire.  Defendant Officers used a CEW on Mr. McGlothen with no regard for this fact.

120.    City of Shreveport Mayor Perkins admitted that he has concerns about the use of force seen in the video of the incident involving Mr. McGlothen.

121.    It is widely known and accepted that when police officers encounter an emotionally distressed person that they should do the following:

      a.      Consider passively monitoring the situation;

      b.      Interact with the EDP calmly and compassionately;

      c.      Request additional resources and a supervisor, if needed;

      d.      Apply the least amount of force consistent with public, EDP, and officer safety;

      e.      Take actions which de-escalate the situation safely for all involved individuals;

      f.      Use calming techniques;

g.    Practice patience and self-control.

122.    Defendant Officers did none of the proscribed methods for dealing with an EDP during their second or third encounter with Mr. McGlothen which included calling officers trained in crisis intervention.

123.    It is widely known and accepted that when officers are dealing with an EDP that supervisors and commanders or crisis intervention officers should monitor police responses involving EDPs and take all of the following actions:

a.    Respond to the scene;

b.    Assist officers in formulating an effective response;

c.    Assist officers in securing appropriate resources;

d.    Closely monitor the use of force;

e.    Ensure that all reports are complete.

124.    No supervisor or commander did any of the actions proscribed under the circumstances on April 5, 2020.

125.    Defendants Ross, LeClare, McCarter, Johnson, Glass, Yelvington, and Richardson received no certifications from training specifically related to handling emotionally disturbed persons.

126.    Crisis intervention training (CIT) was first developed in 1988. Defendant City has known or should have known for decades that police officers and first responders such as paramedics and fireman need crisis intervention training.

127.    Upon information and belief, had Defendants Ross, LeClare, McCarter, Johnson, Glass, Yelvington, and Richardson received crisis intervention training and/or

training specifically related to handling emotionally disturbed persons, then Mr. McGlothen's constitutional rights would not have been violated on April 5, 2020 and he would not have been killed.

128.    The SPD Officer who went to Willis-Knighton North after Mr. McGlothen's arrival relayed to ER personnel that he was only exposed to the CEW three (3) times. That is incorrect.

129.    Defendant Officers did not communicate to EMS personnel the details of the encounter with Mr. McGlothen so they were unable to properly evaluate him.

130.    Defendants Ross, LeClare, and Johnson all report that they were filling out paperwork while Mr. McGlothen was in the back of the patrol unit. There are no reports prepared by Defendants Ross, LeClare, McCarter, or Johnson in the State's discovery responses filed with the Caddo Parish Clerk of Court.

131.    Defendants Glass, Yelvington, and Richardson failed to evaluate Mr. McGlothen during their first encounter with him on April 5, 2020.

132.    Defendant Glass did not properly and efficiently manage the operations of EMS during the events involving Mr. McGlothen.

133.    Defendant Glass did not take accountability or responsibility for patient care based on policy and procedures during the events involving Mr. McGlothen.

134.    Defendant Glass did stand several feet away but did not get involved in the scene application or procedures during the events involving Mr. McGlothen.

135.    Defendants Glass, Yelvington, and Richardson did not perform a patient

assessment of Mr. McGlothen to determine his transport need.

136.    Defendants Glass, Yelvington, and Richardson did not assess Mr. McGlothen's vitals including his blood pressure, temperature, pulse oxygenation, respiratory rate, or pulse.

137.    Defendants Glass, Yelvington, and Richardson did not question Defendant Officers for details regarding the events involving Mr. McGlothen.

138.    Defendants Glass, Yelvington, and Richardson did not observe any injuries to Mr. McGlothen but he was battered, scratched, swollen, and bruised all about his face and body.

139.    At the time Defendants Glass, Yelvington, and Richardson assessed Mr. McGlothen, he was clothed in a t-shirt, boxer shorts, socks, and a spit hood. Their failure to observe any injuries to his person is due to the simple fact that they did not examine or assess him whatsoever.  Mr. McGlothen was presented to them as a crazy person who only needed to be cleaned off before being taken to jail and they accepted that version as truth even when lay observations of Mr. McGlothen's person were to the contrary. He was badly beaten and in obvious distress.

140.    Immediately prior to and immediately subsequent to Defendants Glass, Yelvington, and Richardson being in contact with Mr. McGlothen, he was visibly in distress on the video captured by Defendant Johnson's dash cam. But for their deliberate indifference to his condition, they would have performed a proper evaluation and assessment of Mr. McGlothen.

141.    Mr. McGlothen advised Defendants Glass, Yelvington, and Richardson that he could not breathe and their response was not to remove the hood and assess him but rather to quip that since he was talking, he could breathe.  The video is clear and unambiguous that his breathing was labored and he was in distress.

142.    Defendants Glass, Yelvington, and Richardson did not perform a thorough patient assessment of Mr. McGlothen which resulted in the lack of appropriate medical treatment and intervention.

143.    Defendants Glass, Yelvington, and Richardson did not assess Mr. McGlothen based on their level of training and they did not provide care for the patient based on the standing orders or EMS protocol.

144.    Defendants Glass, Yelvington, and Richardson failed to manage the operations of the scene during the events involving Mr. McGlothen.

145.    Defendants Glass, Yelvington, and Richardson did not apply the appropriate use of policy for the operations of EMS during the events involving Mr. McGlothen.

146.    Defendant Glass chose to let his crew members handle the scene and did not evaluate the circumstances of the scene based on Defendant City Policies, Procedures, or Guidelines during the events involving Mr. McGlothen.

147.    Defendants Yelvington and Richardson did not take accountability or responsibility for management of the scene or patient care based on policy and procedures during the events involving Mr. McGlothen.

148.    Defendant Yelvington did not assume patient care responsibility as senior medic on the scene during the events involving Mr. McGlothen.

149.    At the time of the events which are the subject matter of this Complaint, Defendants Johnson, LeClare, McCarter, and Ross violated the policies of the City of Shreveport by using excessive force on Mr. McGlothen; by not taking him into protective custody when it was abundantly clear based on the totality of the circumstances that he was a person in dire need of care; by not supervising Mr. McGlothen; by not transporting him immediately for medical care; by not intervening during the excessive force of co-Defendants; by failing to complete reports; by providing incomplete and inaccurate information to medical personnel further depriving him of proper medical attention.

150.    Upon information and belief, on April 5, 2020, the only complete report which was generated by the SPD was completed by Sgt. Coney.   Further, upon information and belief, Detective Lane Smith directed Sgt. Coney that no involved officer was to write a report about the events of April 5, 2020, involving Mr. McGlothen.

151.    Prior to being advised that involved officers were expressly not to complete reports, Defendant Officers were advised by a superior on scene that their reports would be sanitized before they were submitted.

152.    Detective Lane Smith's interviews of all Defendant Officers were improper and conducted with the specific intent to mitigate any and all wrongful actions of the

officers involved in Mr. McGlothen's death.[20] Detective Smith used wholly inappropriate leading questions while questioning the Defendant Officers.

153.     Upon information and belief, the Shreveport Fire Department did not commence an investigation into the actions of Defendants Glass, Yelvington, and Richardson until May 2020.

154.     Upon information and belief, none of the Defendant Officers were placed on leave and taken off duty until June 2020, after a citizen's cell phone video was aired on the local news.

155.     On June 3, 2020, almost two months after Mr. McGlothen's death, the Defendant Officers' CEWs were finally seized and downloaded at the request of the Caddo Parish District Attorney.

156.     On June 3, 2020, at the request of the District Attorney, statements were finally taken from all members of the Shreveport Fire Department who responded to either one or both runs to the scene involving Mr. McGlothen.

157.     In June 2020, Officers Lesane, Owen, Perkins, Horton, Duron, Jackson, DeBello, and Coleman finally submitted reports related to the April 5, 2020, encounter with Mr. McGlothen.

158.     Upon information and belief, SPD Internal Affairs interviewed only Defendant Ross in connection with Mr. McGlothen's in-custody death. While other

---

[20] Please refer to this link: https://cochranfirm.sharefile.com/d-s91b610bba59e470b8fb63a51a2aa6587 and Exhibit 1, Disc 3 manually attached to this filing.

officers intermittently present at the scene were briefly interviewed, Defendants McCarter, Johnson, and LeClare were not interviewed by Internal Affairs.

159.    In 2020, Defendant City had twelve (12) officers charged in connection with in-custody deaths.

160.    As a result of the joint and concurrent actions of the Defendants, Mr. McGlothen was killed and his constitutional rights were violated.

**(V)**
**CAUSES OF ACTION**

161.    The Plaintiffs reassert and incorporate all previous paragraphs into each subsequent Count.  Each enumerated count also incorporates all allegations of all other counts.

COUNT ONE:
INDIVIDUAL LIABILITY OF DEFENDANTS JOHNSON, ROSS, LECLARE,
MCCARTER, GLASS, RICHARDSON, YELVINGTON

162.    These Defendants committed the above described actions and/or omissions under the color of law and by virtue of their authority as law enforcement officers, firemen, and employees of Defendant City of Shreveport and substantially deprived Mr. McGlothen of his clearly established rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §1983 and deprived Plaintiff of the rights guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution including, but not limited to:

a.    Freedom from unreasonable search and seizure of his person;

b.    Freedom from deprivation of liberty without due process of law;

c.      Freedom from summary punishment;

d.      Freedom from the use of excessive and deadly force;

e.      Denial of equal protection of the law;

f.      Failure to intervene and stop the violation of Mr. McGlothen's constitutional rights by other Defendants and officers; and

h.      Freedom from arbitrary governmental activity, which shocks the conscience of a civilized society.

163.    These Defendants conspired to interfere with Plaintiffs' civil rights by committing the above described actions and/or omissions under the color of law and by virtue of their authority as law enforcement officers and employees of the City of Shreveport by conspiring to substantially deprive Mr. McGlothen of his clearly established rights, privileges and immunities guaranteed to him as citizens of the United States in violation of 42 U.S.C. §§1981 and 1985 including, but not limited to:

a.      Failing to use reasonable force;

b.      Failing to prepare proper reports of the events;

c.      Failing to follow the policies and procedures of the City of Shreveport;

d.      Engaging in a cover up in an effort to escape liability for the unconstitutional killing of Mr. McGlothen; and

e.      Conspiring for the purpose of impeding, hindering, obstructing, or defeating, the due course of justice.

164.    The Individual Defendants did individually, jointly, and collectively violate the aforementioned constitutional rights of Mr. McGlothen.

165.    The Individual Defendants individually, jointly, and collectively witnessed other officers violate the aforementioned constitutional rights of Mr. McGlothen but conspired to either encourage the violations of Mr. McGlothen's constitutional rights or failed to intervene to prevent Mr. McGlothen's constitutional rights from being violated by fellow officers by covering up their improper and unconstitutional actions. Therefore, these Defendants are jointly and severally liable for the violation of Mr. McGlothen's constitutional rights.

166.    As a result of the following acts and omission, these Defendants violated Mr. McGlothen's constitutional and federally protected rights and, Mr. McGlothen was killed.

COUNT TWO:
MUNICIPAL LIABILITY AGAINST CITY OF SHREVEPORT

167.    The City is under a constitutional duty to properly hire, provide policy guidance, train, supervise and discipline the members of the SPD and SFD to ensure that the activities of the SPD and SFD are run in a lawful manner, preserving to the citizens of the City the rights, privileges, and immunities guaranteed to them by the Constitutions of the United States of America and the State of Louisiana and the laws of the United States of America and the State of Louisiana.

168.    The actions of the SPD and SFD employees in this case violated Mr. McGlothen's federal and state constitutional rights as specified herein and resulted in his death.

169.    As a result of the policies against institutionalizing persons, police officers and first line responders have become the frontline professionals to manage persons when they are in crisis as a result of mental illness.  Since the late 1980s law enforcement departments have developed crisis intervention units who have specific training with respect to handling emotionally disturbed persons.  Accordingly, there is an obvious need to provide officers training with respect to handling emotional disturbed persons, such as crisis intervention training.  This training allows officers to recognize persons suffering from mental disabilities and provide de-escalation training to avoid the unnecessary use of force on persons suffering from mental disabilities.

170.    The City had a duty to serve and protect all citizens, including those who suffer from mental illness, according to Mayor Perkins. Specifically, Mayor Perkins stated "First and foremost, Shreveport police officers are charged with serving and protecting all of our citizens and that includes those with mental illness."

171.    The City had a duty to do everything possible to ensure the well-being of those in its custody, including Mr. McGlothen, according to Mayor Perkins. Specifically, Mayor Perkins stated "We're responsible for those in our custody and we must do everything we can to ensure their safety and well being."

172.    The City had defective and insufficient training regarding responding to emotionally disturbed persons and Mayor Perkins openly admitted the training was insufficient following the death of Mr. McGlothen. Specifically, Mayor Perkins stated that both Shreveport Police Department and Shreveport Fire Department will receive more extensive training for excited delirium and other psychiatric conditions. Mayor Perkins

stated his goal is for first responders to detect the signs and symptoms earlier and intervene.

173.    The City has been on notice, actual and/or constructive, for decades regarding the need for officer training in use of force and de-escalation procedures specifically with emotionally disturbed persons.  Since the late 1980s, governmental entities have had to deal with persons suffering from mental disabilities on a routine basis and have enacted specialized crisis intervention units and training to educated officers on mental illness and the tactics to be utilized during such an encounter.

174.    For at least twenty years, the City of Shreveport has maintained a budget and insurance specifically to compensate victims with circumstances similar to that of Mr. McGlothen. The culture of ignoring and condoning excessive force upon the mentally ill is systemic and deeply entrenched in the City of Shreveport's Police Department and Fire Department.

175.    By ignoring the need for officer and firemen training pertaining to emotionally disturbed persons (EDPs), Defendant City was deliberately indifferent to Mr. McGlothen's rights.

176.    The City permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice, or custom of its police officers and firemen, including Defendants Ross, LeClare, Johnson, McCarter, Glass, Yelvington, and Richardson, violating the constitutional rights of the public at large, including Mr. McGlothen.

177.    The City has been previously put on notice through litigation of its deficient training and supervision of officers with the Shreveport Police Department with regard

to excessive force in *Muslow*[21], *Tucker*[22], and *Adams*[23]. Specifically, in *Adams* the City of Shreveport was alleged to have "insufficient training in the specific area of responding to emotionally disturbed persons (EDPs)."[24]

178.   Upon information and belief, the City of Shreveport has settled many claims substantially similar to Mr. McGlothen's extrajudicially.

179.   Defendant City had no intention of taking any action against any of the individually named Defendants until the citizen's cell phone footage aired on the news in June 2020. At the time the video aired, Defendant Officers were still on the job and Defendant Raymond had publicly stated that he had reviewed the footage [from the dash cams] and saw nothing wrong with the Defendant Officers' actions.

180.   The actions of the Individual Defendants complained of herein were unjustified, unreasonable, unconstitutional, excessive, and grossly disproportionate to the actions of Mr. McGlothen, if any, and constituted an unreasonable search and seizure effectuated through the use of excessive and deadly force and a deprivation of Mr. McGlothen's constitutional rights secured to him by the Fourth and Fourteenth Amendment of the United States Constitution and other federally protected rights.

181.   The City is directly liable to the Plaintiffs for damages due to following policies, practices, and customs of the SPD and SFD which were in effect at the time and

---

[21] *Muslow v. City of Shreveport*, 491 F.Supp.3d 172 (WD LA 9/30/2020). While this opinion is dated September 30, 2020, the cause of action accrued on or about September 12, 2016.
[22] *Tucker v. City of Shreveport*, 998 F.3d 165 (US 5 Cir. 5/18/2021). While the Fifth Circuit opinion is dated 2021, the cause of action accrued on or about November 30, 2016.
[23] *Adams v. City of Shreveport*, 269 F.Supp.3d 743 (WD LA 8/28/2017).
[24] Id.

which were maintained with deliberate indifference to the constitutional rights of citizens and each of which, either individually or in combination with each other, were the underlying cause of the constitutional violations:

a. Failure to provide the SPD and SFD with sufficient funds for proper operation of the SPD and SFD.

b. Failure to have adequate and proper written policy guidance regarding obvious and recurring law enforcement activities with respect to:
1) patrolling procedures;
2) *Terry* stops;
3) misdemeanor stops;
4) felony stops;
5) use of force;
6) use of deadly force;
7) use of intermediate force weapons;
8) apprehending/arresting suspects;
9) involuntary mental health holds/arrests;
10) foot pursuits;
11) use of audio/video recording devices;
12) providing medical attention;
13) summoning medical attention;
14) arresting procedures;
15) completion of reports and collection of evidence;
16) completion of Use of Force Reports;
17) investigating officer compliance with policy and procedure and critical incidents;
18) monitoring officer compliance with policy including;
19) crisis intervention;
20) emotionally disturbed persons;
21) early warning systems; and
22) civil rights laws and violations.

c. Failure to properly and adequately train the SPD's officers and SFD's firemen, including but not limited to the Individual Defendants, regarding obvious law enforcement activities including, but not limited to:
1) patrolling procedures;
2) *Terry* stops;
3) misdemeanor stops;

4) felony stops;
5) use of force;
6) use of deadly force;
7) use of intermediate force weapons;
8) apprehending/arresting suspects;
9) involuntary mental health holds/arrests;
10) foot pursuits;
11) use of audio/video recording devices;
12) providing medical attention;
13) summoning medical attention;
14) arresting procedures;
15) completion of reports and collection of evidence;
16) completion of Use of Force Reports;
17) investigating officer compliance with policy and procedure and critical incidents;
18) monitoring officer compliance with policy including;
19) crisis intervention;
20) emotionally disturbed persons;
21) early warning systems; and
22) civil rights laws and violations.

c.     Failure to properly and adequately supervise and discipline the SPD's officers and SFD's firemen, including but not limited to the Individual Defendants, regarding obvious law enforcement activities including, but not limited to:

1) patrolling procedures;
2) *Terry* stops;
3) misdemeanor stops;
4) felony stops;
5) use of force;
6) use of deadly force;
7) use of intermediate force weapons;
8) apprehending/arresting suspects;
9) involuntary mental health holds/arrests;
10) foot pursuits;
11) use of audio/video recording devices;
12) providing medical attention;
13) summoning medical attention;
14) arresting procedures;
15) completion of reports and collection of evidence;
16) completion of Use of Force Reports;

17) investigating officer compliance with policy and procedure and critical incidents;
18) monitoring officer compliance with policy including;
19) crisis intervention;
20) emotionally disturbed persons;
21) early warning systems; and
22) civil rights laws and violations.

d. Failure to adequately monitor and evaluate the performance of the SPD's officers and SFD's firemen, including but not limited to the Individual Defendants, regarding their compliance with the laws and policies, practices and customs with respect to:

1) patrolling procedures;
2) *Terry* stops;
3) misdemeanor stops;
4) felony stops;
5) use of force;
6) use of deadly force;
7) use of intermediate force weapons;
8) apprehending/arresting suspects;
9) involuntary mental health holds/arrests;
10) foot pursuits;
11) use of audio/video recording devices;
12) providing medical attention;
13) summoning medical attention;
14) arresting procedures;
15) completion of reports and collection of evidence;
16) completion of Use of Force Reports;
17) investigating officer compliance with policy and procedure and critical incidents;
18) monitoring officer compliance with policy including;
19) crisis intervention;
20) emotionally disturbed persons;
21) early warning systems; and
22) civil rights laws and violations.

e. Failure to adequately respond to and investigate complaints regarding officer misconduct by the citizenry of the SPD's officers and SFD's firemen, including but not limited to the Individual Defendants, regarding:

1) patrolling procedures;
2) *Terry* stops;

3) misdemeanor stops;
4) felony stops;
5) use of force;
6) use of deadly force;
7) use of intermediate force weapons;
8) apprehending/arresting suspects;
9) involuntary mental health holds/arrests;
10) foot pursuits;
10) use of audio/video recording devices;
12) providing medical attention;
13) summoning medical attention;
14) arresting procedures;
15) completion of reports and collection of evidence;
16) completion of Use of Force Reports;
17) investigating officer compliance with policy and procedure and critical incidents;
18) monitoring officer compliance with policy including;
19) crisis intervention;
20) emotionally disturbed persons;
21) early warning systems; and
22) civil rights laws and violations.

182.    The City knew or should have known that the above-referenced policies, practices, and/or customs, translated into an under qualified and undertrained police force and EMS personnel that were ill-equipped to perform obvious and necessary law enforcement activities without exposing the public to unwarranted danger of injury. Therefore, the City's policymakers were on actual or constructive notice of the deficiencies with its policies, practices, and customs which make officer and EMS misconduct a foreseeable consequence.

183.    The application of the afore-mentioned policies, practices and customs, resulted in a police department that was run with deliberate indifference to the rights of persons suffering from mental disabilities in that: 1) employees of the SPD and SFD failed to have adequate written policy guidance regarding encounters with persons with

disabilities; 2) employees of the SPD and SFD failed to have adequate training with respect to responding to calls involving persons suffering from mental disabilities which would include early identification of persons suffering from mental disabilities, de-escalation techniques and the involuntary commitment process; 3) the SPD and SFD failed to have proper mechanisms in place to properly evaluate officer's encounters with emotionally disturbed persons and use of force; and 4) the SPD and SFD failed to properly investigate and discipline officers for violation of policy and the constitutional rights of citizens.

184.    Given the decline of institutionalization of citizens for mental illness, police and first responded have become the front line responders to persons with mental illnesses or suffering from a mental crisis.  As a result, there is a moral certainty that police officers and firefighters will have to encounter  persons with a mental illness or suffering from a mental crisis.  Without proper policy and training with respect to dealing with emotionally disturbed persons, these encounters can, and unfortunately do, result in serious injury and death.

185.    The City knew or should have known that the above-referenced policies, practices, and/or customs, would likely lead to the serious injury or death to persons suffering from a mental crisis in the City of Shreveport and that such injuries were foreseeable; yet, they disregarded that risk.

186.    The aforementioned policies, practices and customs were inadequate in relation to the specific tasks their officers and EMS personnel must routinely perform

and therefore, illustrated its deliberate indifference and/or reckless disregard to the consequences of officer and EMS misconduct.

187.    The City's above referenced policies, practices and/or customs violated Mr. McGlothen's constitutional rights; and said policies, practices, and/or customs were the moving force behind and proximate cause of said violations.

188.    The City's above referenced policies, practices, and/or customs demonstrated a deliberate indifference on the part of policymakers of the City to the constitutional rights of citizens, including Mr. McGlothen, and was the proximate cause of the injuries and damages sustained by Mr. McGlothen, and evidenced a reckless or callous indifference to the federally protected rights of Mr. McGlothen.

189.    By failing to recognize or correct the deficiencies with its policies, practices, and customs, the City consciously disregarded the known and foreseeable consequences thereof.

190.    The City's deliberately indifferent policies, practices, and customs were closely related to Mr. McGlothen's injuries and death.

191.    The City's deliberately indifferent policies, practices, and customs were the moving force behind Mr. McGlothen's injuries, his death, and the deprivation of his constitutional rights.

192.    There is a direct causal link between the policies, practices, and customs and the violation of Mr. McGlothen's constitutional rights.

193.    As a direct and proximate result of the foregoing policies, practices and customs of the City, the violation of the constitutional rights of citizens by the members

48

of the SPD, SFD, and the Individual Defendants was substantially certain to occur.  In addition, as a direct and proximate result of the aforementioned policies, practices and customs of the City, Mr. McGlothen's constitutional rights were violated and he was injured and killed.

COUNT THREE:<br>SUPREVISORY LIABILITY OF DEFENDANTS RAYMOND AND WOLVERTON

194.    At all relevant times, Defendant Raymond was the Chief of Police of the City of Shreveport with final policy-making authority with respect to law enforcement activities.

195.    At all relevant times, Defendant Wolverton was the Fire Chief of the City of Shreveport with final policy-making authority with respect to the SFD's activities, including EMS.

196.    In the course and scope of their employment, Defendants Raymond and Wolverton did in fact establish policies, practices, and procedures for the SPD and SFD.

197.    All of the policies, practices, and customs attributed to the City in this Complaint were personally designed, implemented, and enforced at least in part by Defendants Raymond and Wolverton.

198.    Defendants Raymond and Wolverton personally condoned, encouraged, approved, or at least implicitly authorized the conduct of the Individual Defendants by having prior warning of their violation of policy and other improper conduct set forth herein.

199.    Defendant Raymond failed to supervise his officers including the supervising officers who were involved in the incident with Mr. McGlothen. As evidenced by the dash cam video, there was no clear supervisory structure being enforced during any of the three calls involving Mr. McGlothen. Further, Defendant Officers were given conflicting orders by various supervising officers on scene and those who got involved telephonically. Defendant Raymond allowed and condoned his officers and supervisors intentionally violating policies and procedures in an attempt to cover up Defendant Officers' actions.

200.    Defendant Raymond allowed his officers and supervisors to deviate from and/or violate Shreveport Police Department policies and procedures regarding chain of command, incident reporting, report completion, arrests, booking, use of force, major incident notification, protective custody procedures, restraint and transport of prisoners, Americans with Disabilities Act, and conducted electrical weapons.

201.    After allowing his officers and supervisors to disregard the policies and procedures of the Shreveport Police Department, Defendant Raymond then proceeded to assist in the secretion of the events from Mr. McGlothen's family, the public, and other law enforcement agencies.

202.    Defendant Wolverton allowed his firemen and supervisors to deviate from and/or violate Shreveport Fire Department policies and procedures regarding the Americans with Disabilities Act, medical assessments, and administration of medical treatment.

203.     Defendants Raymond and Wolverton personally failed to properly hire, train, supervise, monitor, and discipline officers of the SPD and firemen of the SFD, including the Individual Defendants on particular tasks required of officers as set forth in Count II.

204.     By failing to recognize or correct these deficiencies with the policies, practices, and customs of the SPD and SFD, Defendants Raymond and Wolverton personally showed deliberate indifference to the rights of people with whom SPD and SFD regularly came in contact, including Mr. McGlothen.  This deliberate indifference is illustrated by SPD not commencing an investigation into Mr. McGlothen's death until it was so requested by the Caddo Parish District Attorney.

205.     By failing to recognize or correct these deficiencies with the policies, practices, and customs of the SPD and SFD, Defendants Raymond and Wolverton consciously disregarded the known and foreseeable consequences thereof.

206.     After the citizen's video of the third encounter aired on the local news, Defendant Raymond released a statement that the video was only a small portion of everything that transpired and urged the public to not form opinion based on that one video. Defendant Raymond further states that the department is taking the matter very seriously. In reality, Defendant Officers remained on duty and no substantive action was taken by either Chief Raymond or Defendant City until June 2020, two months after Mr. McGlothen's death.

207.     Defendant Raymond claimed that an investigation was initiated as soon as the incident involving Mr. McGlothen occurred. He further claimed that the Louisiana

State Police and Office of the District Attorney were asked to review the matter. In reality, the Office of the District Attorney got involved at the request of the Caddo Parish Coroner.

208.    Defendant Raymond effectively condoned and ratified the Defendant Officers' actions and publicly stated that he had reviewed the [dash cam] video and took no exception with the contents of that video and audio.

209.    Defendant Raymond claimed publicly that a thorough investigation had been conducted into the events surrounding Mr. McGlothen's death. While there were many statements taken in connection with this matter, the investigation was slanted to protect the Defendant Officers, Defendant City, and Defendants Wolverton and Raymond. The recorded statements taken in connection with this matter were improper and an affront to Mr. McGlothen and his family. Not even internal affairs conducted a proper investigation into this matter.

210.    These deficiencies with the policies, practices, and customs of the SPD and SFD were closely related to Mr. McGlothen's injuries and death.

211.    There is a direct causal link between the aforementioned policies, practices, and customs and the violation of Mr. McGlothen's Constitutional rights.

212.    As a direct result of Defendants Raymond and Wolverton's policy, practice, or customs, Mr. McGlothen's constitutional rights were violated and Mr. McGlothen was killed.

COUNT FOUR:
STATE LAW CLAIMS

213.    The acts and omissions set forth herein constitute assault, battery, wrongful death, outrageous conduct, conspiracy, negligence, gross negligence, and/or recklessness under the laws of the State of Louisiana.

214.    Defendants Ross, LeClare, McCarter, and Johnson had a duty to do all of the following:

a.    Follow all policies and procedures of the Shreveport Police Department;

b.    Act at all times like a reasonable and prudent person under the circumstances;

c.    Use reasonable force;

d.    Intervene and stop the use of excessive force;

e.    Promptly obtain medical treatment for Mr. McGlothen;

f.    Properly restrain and transport Mr. McGlothen.

215.    Defendants Ross, LeClare, McCarter, and Johnson failed to do all of the following:

a.    Follow the Shreveport Police Department General Orders regarding chain of command, incident reporting, completion of reports, arrests, booking, use of force, radio communication, major incident notification, recording, protective custody, restraint and transport, Americans with Disabilities Act, and conducted electrical weapons;

53

b.      Act as reasonable persons under the circumstances;

c.      Use excessive force upon Mr. McGlothen;

d.      Intervene to stop the excessive force being used by co-Defendants;

e.      Obtain medical treatment for Mr. McGlothen prior to him losing consciousness;

f.      Restrain and transport Mr. McGlothen pursuant to policy and procedure.

216.    Defendants Glass, Yelvington, and Richardson had a duty to follow all policies and procedures of the Shreveport Fire Department.

217.    Defendants Glass, Yelvington, and Richardson failed to follow the policies and procedures regarding medical assessments and treatment regarding Mr. McGlothen.

218.    Defendant Raymond had a duty to do all of the following:

a.      Promulgate and institute effective policies and procedures for the Shreveport Police Department;

b.      Follow all policies and procedures of the Shreveport Police Department;

c.      Ensure that all officers under his command follow all policies and procedures of the Shreveport Police Department.

219.    Defendant Raymond failed to do all of the following:

a.      Promulgate and institute effective policies and procedures for the Shreveport Police Department;

b.      Follow all policies and procedures of the Shreveport Police

54

Department;

    c.    Ensure that all officers under his command follow all policies and procedures of the Shreveport Police Department.

220.    Defendant Wolverton had a duty to do all of the following:

    a.    Promulgate and institute effective policies and procedures for the Shreveport Fire Department;

    b.    Follow all policies and procedures of the Shreveport Fire Department;

    c.    Ensure that all firemen under his command follow all policies and procedures of the Shreveport Fire Department.

221.    Defendant Wolverton failed to do all of the following:

    a.    Promulgate and institute effective policies and procedures for the Shreveport Fire Department;

    b.    Follow all policies and procedures of the Shreveport Fire Department;

    c.    Ensure that all firemen under his command follow all policies and procedures of the Shreveport Fire Department.

222.    Upon information and belief, Defendant Insurer provides both liability and excess coverage to the City of Shreveport for the damages asserted and sustained herein.

223.    Defendant Insurer, upon information and belief, has issued or currently has in effect, one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated Defendant, jointly

and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiffs or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiffs under the terms of its policies.

224.     Upon information and belief, Defendant Insurer is liable to Plaintiffs for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

225.     Under *Louisiana Revised Statute § 22:1269*, the Louisiana Direct Action Statute, Plaintiffs bring a direct action against Defendant Insurer to recover any and all sums they are obligated to pay Plaintiffs on behalf of their insureds or to indemnify their insureds.

226.     Plaintiffs bring these state actions against the applicable Defendants as set forth under Louisiana law, which includes claims against the City of Shreveport for all actions performed by the Defendants in the course and scope of their employment with the City of Shreveport and against the Individual Defendants for actions that are found to be outside the course and scope of the employment.

**(VI)**
**DAMAGES**

227.     As a direct and proximate result of the aforementioned actions and omissions of the Defendants, Mr. McGlothen's constitutional rights were violated and Mr. McGlothen was killed.  Plaintiffs seek recovery from the Defendants, both jointly and

severally, of all damages to which they may be entitled for the wrongful death of Mr.

McGlothen under the law for his wrongful death and which include, but are not limited

to, the following:

a.  Physical pain and suffering;
b.  Emotional pain and suffering;
c.  Medical expenses;
d.  Funeral expenses;
e.  Loss of enjoyment of life;
f.  Loss of wages;
g.  Loss of earning capacity;
h.  Loss of consortium and services of Mr. McGlothen to his heirs and beneficiaries;
i.  Loss of the right to familial association with Mr. McGlothen to his heirs and beneficiaries;
j.  Hedonic damages;
k.  The full pecuniary value of the life of Mr. McGlothen;
l.  Punitive damages against the applicable Defendants;
m.  Pre- and post-judgment interest;
n.  Statutory and discretionary costs;
o.  Attorney's fees;
p.  A declaratory judgment that the acts and conduct herein was unconstitutional;
q.  Injunctive relief precluding the Defendants from engaging in the conduct complained of herein in the future and requiring the City of Shreveport to provide proper policy, training and supervision of its officers and holding them accountable for their misconduct; and
r.  All such further relief, both general and specific, to which he may be entitled under the premises.

**(VII)**
**PRAYER FOR RELIEF**

228.   Plaintiffs hereby incorporate, in its entirety, each and every paragraph

contained in this *Third Amended Complaint* and by reference makes said Paragraphs a part

hereof as if fully set forth herein.

229.   WHEREFORE, PREMISES CONSIDERED, Plaintiffs sue the Defendants,

both jointly and severally, for the injuries sustained and wrongful death of Mr.

McGlothen and prays for a judgment against the Defendants for compensatory damages

in an amount to be determined by a jury as reasonable and for all such further relief, both general and specific, to which he may be entitled under the premises.

230.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs sue Defendants, both jointly and severally and prays for a judgment against the applicable Defendants for punitive damages in an amount to be determined by a jury as reasonable and for all such further relief, both general and specific, to which he may be entitled under the premises.

231.    A JURY IS RESPECTFULLY DEMANDED TO TRY THE ISSUES ONCE JOINED.

Respectfully submitted,

The Cochran Firm
Trials & Mass Torts

 /s/ Ashley L. Page
James Carter (#26841)
Jeffrey A. Mitchell (#19711)
Ashley L. Page (#30285)
Shean Williams (*pro hac vice*)
Samuel Starks (*pro hac vice*)
3850 N. Causeway Boulevard, Ste. 1500
Metairie, Louisiana 70002
Tel. 504.612.7000
Fax 504.612.7001
jcarter@cochrantrials.com
jmitchell@cochranfirmnola.com
apage@cochranfirmnola.com

*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I, Ashley L. Page, do hereby certify that I have this date served the following with a copy of the following has been served on all counsel of record pursuant to the Court ECF filing system

THIS, the 5th day of May, 2022.

/s/ Ashley L. Page